Argued and submitted September 17, 2008; on appeal, judgment on claim for legal negligence reversed and remanded for new trial with instructions to strike paragraphs 16(a) and 16(b) from plaintiff's complaint, judgment on counterclaim for breach of written contingent fee contract reversed and remanded; on cross-appeal, judgments for directed verdict on slander of title and misuse of civil proceedings claims involving *lis pendens* and statutory lien reversed and remanded with instructions to reinstate the jury verdicts on those claims; otherwise affirmed September 9, 2009

Valerium PEREIRA,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

Roy THOMPSON
and Thompson & Bogran, P.C.,
an Oregon professional corporation,
*Defendants-Appellants*
*Cross-Respondents.*

Multnomah County Circuit Court
041010858; A133677

217 P3d 236

I. Franklin Hunsaker and Jonathan M. Radmacher argued the cause for appellants - cross-respondents. With them on the briefs was McEwen Gisvold, LLP.

Bruce L. Campbell argued the cause for respondent - cross-appellant. On the briefs were Mark M. McCulloch, Corey B. Tolliver, and McCulloch & Bennett, LLP.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ARMSTRONG, J.

.

## ARMSTRONG, J.

Attorney Thompson and his law firm, Thompson & Bogran, P.C., (defendants) represented Pereira (plaintiff) on matters relating to a California trust of which plaintiff was a beneficiary. That representation spawned this labyrinthine litigation. Defendants appeal a judgment on a jury verdict on plaintiff's legal negligence claim and on defendants' breach of contract counterclaims; plaintiff cross-appeals and assigns error to trial court orders directing verdicts for defendants on plaintiff's claims for slander of title and misuse of civil proceedings. For the reasons that follow, we (1) reverse and remand for a new trial on plaintiff's negligence claim; (2) reverse and remand on defendants' counterclaim for breach of the parties' contingent fee agreement; and (3) reverse and remand the trial court's order directing verdicts on plaintiff's slander of title and misuse of civil proceedings claims except for the claim involving the California fee litigation.

## I. FACTS AND PROCEDURAL HISTORY

We begin with a brief description of the facts and procedural history, which we will supplement with relevant details in the discussions of each assignment of error. Plaintiff, a Portland hairstylist, was the primary beneficiary of a trust established by his former partner (the settlor), who died in April 2001. As beneficiary, plaintiff was to receive full or partial interest in 13 parcels of real property in Palm Springs, California. Plaintiff had retained an attorney to represent him regarding the trust, which was managed by a large bank located in southern California (the bank). As of April 2003, plaintiff had not received any disbursement from the trust. At that point, plaintiff approached the bank about releasing the properties to him. According to the bank, it was finalizing estate tax issues for IRS purposes and, because of that, would not release the properties to plaintiff. The bank told plaintiff that it could proceed in either of two ways: (1) it could release the properties to plaintiff, provided that he deposit a $75,000 reserve from which the bank could draw if any additional problems arose with the estate taxes on the properties; or (2) plaintiff could simply wait until the bank received a closing letter from the IRS indicating that the

estate tax issues had been resolved, which it told plaintiff could arrive as soon as the next day or as late as the next year.

Shortly thereafter, plaintiff expressed his frustration with the trust administration to a salon client, Bogran, who was a partner in the defendant law firm. Bogran told plaintiff that the amount of time that the trust administration was taking and the bank's request for a $75,000 reserve were "absurd" and offered to have her and her partner, Thompson, look over plaintiff's paperwork. Plaintiff accepted her offer.

In May 2003, Thompson met with plaintiff and told him, among other things, that plaintiff was a "victim of the system" and that the bank had mismanaged funds, had overcharged $450,000 in professional fees, and possibly had committed fraud. Thompson told plaintiff that he would contact the bank and demand that it release the properties to plaintiff. If that demand were unavailing, Thompson recommended that plaintiff "engage a lot of different litigation[ ]," including initiating an action in Oregon against the bank to force it to distribute the properties. He told plaintiff that, by employing that strategy, the matter could be resolved within a few months. Thompson further told plaintiff that, along with obtaining the properties and recovering the alleged overcharges, plaintiff had a very good chance of recovering his own attorney fees. Thompson did not tell plaintiff that the bank's attorneys would be paid from the trust or that plaintiff might have to initiate or defend litigation in California.

Plaintiff discharged his existing attorney and hired defendants; however, plaintiff and defendants did not immediately establish a fee arrangement for that representation. On May 30, 2003, Thompson wrote a letter to the bank and its attorneys, in essence, stating that his office represented plaintiff; challenging the bank's handling of the trust, its retention of attorneys in the matter, and its use of trust assets to pay its attorneys; and demanding that the bank immediately distribute plaintiff's assets.

An attorney for the bank, Reich, responded in a letter to Thompson dated June 6, 2003 (the Reich letter). In that letter, Reich first explained that it was customary for a bank

to retain counsel in administering a trust and that, by its terms, the trust authorized the bank to do so and to pay its retained counsel from trust assets. He also briefly explained the decisions that the bank had made regarding the trust and the tax filings associated with it, all of which had been communicated to plaintiff and his previous attorney. According to Reich, administration of the trust was particularly complicated for tax purposes because the settlor's records were in disarray, the settlor had not filed tax returns for several years, he had owned partial interests in numerous real properties, and he had not properly transferred several properties to the trust. Reich then stated that the bank remained willing to abide by plaintiff's decision either to wait for the IRS closing letter or to provide a reserve to receive his properties, and explained that, if the bank and plaintiff could not come to an agreement, then the bank might be forced to file a petition with the court for instructions and for a formal accounting of the trust, which would further deplete trust assets.

In the meantime, Thompson and plaintiff discussed the details of their fee arrangement for Thompson's representation of plaintiff. Thompson wrote a letter to plaintiff dated June 3, 2003, in which he explained that, although his office rarely took cases on a contingent fee basis, his office was willing to do so for him because the "case [was] exceptionally strong" and they "strongly believe[d]" in his case. Thompson also encouraged plaintiff to contact him with questions and to consult with another attorney regarding the case and fee arrangements. Thompson attached a fee agreement that provided, among other things, that plaintiff would pay defendants 15 percent of the assets "currently held" by the bank, upon their distribution to plaintiff, and 33 percent of "any additional assets obtained from [the bank] or other Defendants." Plaintiff signed that agreement on June 10, 2003.

Thompson then sent plaintiff another letter because he was "concerned about what may, or may not, be a confusion on [plaintiff's] part" regarding the agreement. He explained that the 15 percent provision applied only to the assets held by the bank and that the 33 percent provision applied to any additional assets, such as any amounts allegedly drained from the trust due to the bank's mismanagement, recovered by plaintiff. Thompson further explained that they needed to file a petition within the next week and

have it ready to file and serve on the bank "before [the bank] files anything in California (and follows through with their threat to incur even more legal expenses to be drawn from the Trust)." Plaintiff testified that, at the time that he signed the contingent fee agreement, he did not know of the Reich letter or its contents; rather, he did not learn of it until more than a year later, after he had fired defendants. He stated that, had he seen and read the letter, he would not have hired defendants or initiated litigation against the bank, because he believed that the Reich letter adequately addressed his concerns and indicated that the trust administration would be completed while maintaining the trust assets at their highest possible value.

Defendants filed a petition against the bank in circuit court in Oregon on June 30, 2003, seeking instructions to the trustee; the court dismissed the petition for lack of subject matter jurisdiction because none of the property in the trust was located in Oregon. The bank, in early July 2003, filed a petition in a California court for an order confirming the ownership of trust assets. Defendants represented plaintiff in that litigation, which eventually resulted in plaintiff obtaining from the trust his interest in 11 of the 13 properties in fall 2003; the remaining two properties were held in the trust to fund the bank, as trustee, against future litigation threatened by plaintiff. Plaintiff was unhappy with the result because the bank held property worth substantially more than the $75,000 reserve that it had originally requested and because defendants did not seek an award of plaintiff's attorney fees. Thompson assured plaintiff that he would recover those last two properties; ultimately, however, the bank liquidated those properties to cover its costs.

Defendants continued to represent plaintiff on matters related to the trust, as well as other matters. In spring 2004, defendants met with plaintiff to discuss further litigation against the bank and its attorneys; at that point, Thompson told plaintiff that, beginning six months earlier, defendants had begun charging plaintiff at their hourly rate for certain work. Plaintiff was "speechless," and testified that that was the first that he had heard about such an arrangement and that he and defendants had not had any discussions regarding a change in the fee agreement. Thompson disputed that testimony and said that he had told plaintiff in

November 2003, at the point that the court had ordered the bank to release the properties, that the contingent fee agreement was completed and that defendants would begin charging plaintiff hourly for additional work on his behalf, including pursuing the last two properties held by the bank. However, Thompson also acknowledged that, in the first several months of billing plaintiff at the hourly rate, defendants had erroneously sent plaintiff bills that did not clearly segregate the work under the hourly agreement from the work under the contingent fee agreement. Defendants further began pressing plaintiff to pay the fees due under the contingent fee agreement; plaintiff subsequently paid defendants $85,000[1] on $200,000 allegedly due under the contingent fee agreement.

Sometime around September 2004, plaintiff fired defendants and represented himself in the California litigation, which he ultimately settled with the bank, paying $5,000 to cover the bank's remaining costs after it had liquidated the last two trust properties. Subsequently, defendants made several efforts to collect its fees from plaintiff, including filing and recording a *lis pendens* notice in California and a statutory lien in Oregon and initiating a lawsuit in California against plaintiff for breach of contract.

In October 2004, plaintiff filed this action in Oregon for legal negligence against defendants, seeking damages composed of $85,000 for the fees that he had paid to defendants and $243,000, which included the diminution in value of the trust as a result of the claims asserted by defendants in the California trust litigation as well as the costs incurred by plaintiff to resolve that litigation. Additionally, plaintiff asserted claims for (a) slander of title, alleging that defendants' filing and recording of the *lis pendens* and statutory lien were invalid and improper, and (b) misuse of civil proceedings based on the California *lis pendens* and fee litigation against plaintiff. Defendants responded to those claims and asserted counterclaims for breach of contract—and, alternatively, *quantum meruit* relief—on the contingent fee agreement and the oral hourly agreement.

---

[1] For easier reading, we round all figures cited in this opinion to the nearest thousand.

After hearing all of the evidence on the legal negligence claim, the jury determined that defendants were negligent and awarded plaintiff $328,000—all of the damages that he sought. As for the breach of contract counterclaims, the jury determined that there was a contingent fee agreement between plaintiff and defendants but that plaintiff had not breached that agreement, and that there was no oral hourly fee agreement. It did, however, determine that defendants were entitled to *quantum meruit* relief for some of their work, calculating the reasonable value of the services to be $48,000 for work performed under the contingent fee agreement and $10,000 for work performed at an hourly rate. Furthermore, the trial court directed verdicts for defendants on plaintiff's slander of title and misuse of civil proceedings claims, after the jury found in plaintiff's favor on those claims.

On appeal, defendants assert that the trial court erred, as explained in detail below, by permitting plaintiff to recover on his negligence claim and by dismissing defendants' breach of contract counterclaims. Plaintiff, for his part, challenges the trial court's grant of directed verdicts on the slander of title and misuse of civil proceedings claims. We address each of those claimed errors in that order in the following sections.

## II. PLAINTIFF'S LEGAL NEGLIGENCE CLAIM

Plaintiff alleged in paragraph 16 of his first amended complaint that defendants had acted negligently by:

"a. Advising Plaintiff the Purported Written Agreement was reasonable and fair to the Plaintiff;

"b. Advising Plaintiff the Implied Agreement was reasonable and fair to the Plaintiff, and he was bound to its terms;

"c. Advising Plaintiff that he had a strong case for damages and attorney's fees against the trustee and should initiate litigation against the trustee for recovery of damages and attorney's fees;

"d. Failing to warn the Plaintiff that the pursuit of a claim against the trustee was not economically advisable

when measuring the weak prospect of recovery against the certainty of expenses incurred in pursuing the claim and diminution of the trust for the trustee to defend the claim;

"e. Failing to warn Plaintiff that the initiation of a lawsuit against the trustee may prompt litigation by the trustee against plaintiff, and failing to warn plaintiff that defendants would charge additional fees to defend such claim by the trustee[; and]

"f. Initiating litigation in Oregon for the Plaintiff without any realistic prospect of success because of the Oregon courts' lack of jurisdiction."

In asserting that the trial court erred by permitting plaintiff to recover on a negligence theory, defendants raise five assignments of error that we summarize in the order in which we address them: (1) that the trial court erred in instructing the jury on plaintiff's negligence claim that an attorney owes a client a fiduciary duty; (2) that the trial court erred by denying defendants' motion to strike paragraphs 16(a) and 16(b) of the complaint from plaintiff's negligence claim; (3) alternatively, that the trial court erred by denying defendants' motion *in limine* to exclude evidence related to allegations of disloyalty, "taking advantage," bad faith, and rescission; (4) that the trial court erred in allowing expert testimony regarding whether Thompson acted with reasonable care when he advised plaintiff that the contingent fee agreement was reasonable; and (5) that the trial court erroneously accepted an inconsistent jury verdict.

A. *Jury Instruction*

At trial, defendants asked the trial court to give Uniform Civil Jury Instruction (UCJI) 45.01, which states:

"An attorney has the duty to use that degree of care, skill, and diligence ordinarily used by attorneys practicing in the same or similar circumstances in the same or similar community. A failure to use such care, skill, or diligence is negligence."

The trial court informed the parties that, in accordance with discussions between the court and the attorneys that are not part of the record, it had added the following sentence at the end of the above instruction:

> "The attorney and client relationship is a special relationship which carries with it a duty of fair disclosure and dealing."

The trial court explained that it "used slightly different language in describing generally what the relationship is under the definition of the duty owed by an attorney to the client, the standard of care instruction that applies to lawyers." After explaining that addition, the trial court stated, "That's the language that I discussed with all of you," to which one of defendants' counsel responded, "Right." The trial court and parties then moved on to discuss other proposed instructions.

> Later in the proceeding, the following exchange occurred between one of defendants' counsel and the court:

> "[DEFENDANTS' COUNSEL]: Given the fact that we've done the instructions piecemeal, I think there are two instructions that we may have an issue with that we need to simply have on the record. I believe when we talked about instructions before, they weren't completely on the record. I wanted to voice them.

> "[THE COURT]: Which instructions are those?

> "[DEFENDANTS' COUNSEL]: It is the one that for the duty of the attorney, to the extent that it encompasses any of the fiduciary duties and for the reasons that we stated—

> "[THE COURT]: You don't have to tell me. We can do it later as an exception."

After the court read the instruction to the jury, including the last sentence regarding the attorney-client relationship, defendants' counsel stated the following exception:

> "We would—defendant[s] would take exception on the instruction regarding special relationship of a lawyer with his client and a duty of fair disclosure and dealing. We believe that [it] intimates an issue of breach of fiduciary duty, which has not been pleaded in this case in the negligence action."

> The jury delivered its verdict, and in answer to the question on the jury form, "Were the defendants negligent in one or more ways alleged by plaintiff?," the jury said "Yes."

The court polled the jury on that and the other questions presented to it; however, the parties did not request the jury to return special verdicts on each specification of negligence.

On appeal, defendants argue that, as a result of the court's instruction on negligence, the jury reached its verdict based on an erroneous statement of the law. They further assert that the error was not harmless and, thus, that it requires reversal for a new trial. Plaintiff responds that defendants failed to preserve their objection to the instruction with sufficient particularity. Alternatively, plaintiff argues that, even if the objection was properly preserved, the instruction was not erroneous, and that, in any case, any error was invited and harmless.

## 1. *Preservation*

■■ To properly preserve a claim of error on a jury instruction, the party seeking review on appeal must have identified the error to the trial court and made an exception, stated "with particularity," immediately after the court has instructed the jury. ORCP 59 H. In determining whether a party objects with "sufficient particularity," the general rule is that

> " '[a] party who disagrees with a proposed jury instruction must specifically inform the court of the grounds for the exception, so the court may have an opportunity to correct any mistake.' *Propp v. Long*, 129 Or App 273, 277, 879 P2d 187 (1993), *rev den*, 320 Or 271 (1994). The exception must 'call the trial court's attention to a *specific* objection' and must not be 'too general.' *Fickert v. Gallagher*, 274 Or 139, 141, 544 P2d 1032 (1976) (emphasis added)."

*Doe v. Oregon Conference of Seventh-Day Adventists*, 199 Or App 319, 327-28, 111 P3d 791 (2005) (brackets in *Doe*).

For example, in *Doe*, the instruction at issue informed the jury that it could impose liability on the defendant corporation based on the negligence of its agent, regardless of whether the defendant itself was negligent. We held that the defendant's objection was "fatally imprecise" because the defendant simply stated that "[t]his is not a vicarious liability case * * *." *Id.* at 328. We explained that "vicarious liability" is a general term that encompasses a

variety of circumstances, particularly where the only "person" upon whom liability rests is fictive (such as a corporation). In those instances, the only liability that can exist is vicarious. Thus, the exception was not specific enough to alert the trial court to the alleged problem in the challenged instruction. *Id.*

■ Here, unlike in *Doe*, defendants' exception was preserved. As an initial matter, defendants satisfied the procedural requirements of ORCP 59 H: defendants attempted to make an objection before the court gave the jury instruction, and were advised instead to except to it, which defendants did at their first opportunity after the court gave the instruction. Further, defendants' exception was sufficiently precise to alert the court to defendants' contention that the instruction interjected the law for a different claim—breach of fiduciary duty—into a claim for legal negligence. Thus, defendants adequately preserved for appeal their objection to the jury instruction.

2. *Error*

Our next consideration is whether the trial court gave the instruction in error. Defendants argue that the trial court, by inserting that sentence in the jury instruction, improperly inserted a claim for breach of fiduciary duty into a negligence claim. They cite UCJI 50.01, the recommended jury instruction for breach of fiduciary claims, which provides, "[a] fiduciary owes a duty of [undivided loyalty/utmost good faith/full, fair, and frank disclosure/fair dealing/reasonable care]." Defendants assert that the final sentence that the court inserted into the instructions, "[t]he attorney and client relationship is a special relationship which carries with it a duty of fair disclosure and dealing," created a false impression of the law in the jurors' minds and, accordingly, was erroneous.

In response, plaintiff argues that the instruction was not erroneous because claims alleging breach of fiduciary duty and attorney negligence, for purposes of legal malpractice claims, are one and the same claim. For support, he invokes *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 831 P2d 7 (1992). The claim in *Georgetown Realty* was an "excess claim" by an insured against its liability insurer for

failure to use reasonable care to settle a third-party's claim against the insured within the insured's liability policy limits. *Id.* at 100, 100 n 1. At issue, ultimately, was whether a liability insurer was subject to a standard of care independent of, and without reference to, the terms of the contract (or, in short, whether the insured could assert a cognizable claim for damages in tort). *Id.* at 110. The court concluded that the insured could assert a tort claim against the insurer because the insured had relinquished control of its defense (and accordingly, its financial liability) to the insurer, thus creating a special relationship between the parties. *Id.* at 110-11. The court then added, in a footnote:

> "The parties have referred to plaintiff's second claim as a claim for 'breach of a fiduciary duty.' This is a correct appellation in the same sense that one would state a claim for 'breach of a physician's duty,' 'breach of a lawyer's duty,' or 'breach of a landlord's duty.' In each case, the duty is one created by law, the duty is one that arises from the relationship between the parties, and the action is in the nature of an action on the case.

> "The form of action for a claim against a fiduciary for breaching a duty of care arising from the relationship is not materially different from a claim against a physician, a lawyer, or an engineer for breaching a duty of care arising from such a relationship. Notwithstanding repeated references by this and other courts to a 'breach of fiduciary duty,' the form of action is the same, and the theory of recovery—breach of the duty of care that the law implies from the relationship—is the same."

*Id.* at 110-11 n 7.

■ Plaintiff reads that footnote—particularly, the second paragraph—to state that a breach of fiduciary duty claim and an attorney negligence claim are one and the same. According to plaintiff, because the claims are the same, there was no error by the trial court in including the last sentence on fiduciary duty in the jury instruction on legal negligence. We disagree.

To start, *Georgetown Realty* is of limited utility in this case. It speaks to a claim for breach of fiduciary duty in

an insurer-insured relationship, in which the fiduciary allegedly breached a duty to exercise reasonable care in protecting the insured's economic interests. It does not address the attorney-client relationship or contemplate the possible differences between a claim for attorney negligence and a claim for breach of an attorney's fiduciary duty to a client.

Moreover, we do not understand the *Georgetown Realty* footnote to say what plaintiff believes that it says. It does not say that a breach of fiduciary duty claim is identical to or interchangeable with a legal negligence claim. Rather, it says that "*the form of action*" in both cases is the same. Read in context with the rest of the footnote, we understand the court simply to be stating that both types of claims are based on a failure to meet the applicable standard of conduct, whether that standard concerns professional competence, as in a negligence claim, or loyalty, as in a breach of fiduciary duty claim. *See Rathgeber v. James Hemenway, Inc.*, 335 Or 404, 417 n 8, 69 P3d 710 (2003) (observing that pleadings in that case alleged "essentially a claim for real estate professional malpractice" and referencing the *Georgetown Realty* footnote).

That reading is consistent with the traditional understanding of the two torts and the distinct treatment of them by Oregon courts. Dobbs explains:

> "Quite apart from the duty of competence and professional care, lawyers are fiduciaries to their clients. Lawyers can thus think of fiduciary breach as a form of professional malpractice or an entirely separate ground for liability. Whether or not both fiduciary breach and negligence both fit under the umbrella of professional malpractice, *the two torts are not the same*. 'Professional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty.' Thus, if breach of fiduciary duty is a form of lawyer malpractice, it is a distinct one with rules that do not necessarily turn on traditional negligence analysis."

Dan B. Dobbs, *The Law of Torts* § 487, 1392 (2000) (footnotes omitted; emphasis added). Mallen and Smith further describe the differences between the two torts:

"Although the attorney-client relationship imposes fiduciary obligations, negligent conduct alone usually does not implicate a breach of these obligations. The lawyer may have acted negligently, but with undivided loyalty and [preservation of] the client's confidences. Conversely, a breach of the obligation of confidentiality can be a wrong independent of the standard of care or may be accompanied by a failure to maintain undivided loyalty."

Ronald E. Mallen & Jeffrey M. Smith, 2 *Legal Malpractice* § 15:2, 665-66 (2009) (footnotes omitted).

■■■ Moreover, our courts have established distinct elements and rules for each type of claim. For example,

"[i]n the traditional legal malpractice action, as in other tort actions in which there is a special relationship between the plaintiff and the defendant, the plaintiff usually must allege and prove (1) a *duty* that runs from the defendant to the plaintiff; (2) a *breach* of that duty; (3) a resulting *harm* to the plaintiff measurable in damages; and (4) *causation, i.e.,* a causal link between the breach of duty and the harm."

*Stevens v. Bispham,* 316 Or 221, 227, 851 P2d 556 (1993) (emphasis in original). By virtue of their relationship, an attorney owes a client a duty of care. *Onita Pacific Corp. v. Trustees of Bronson,* 315 Or 149, 160, 843 P2d 890 (1992). In a legal negligence claim, the issue is whether the attorney violated the duty of care, which is "to act as a reasonably competent attorney in protecting and defending the interests of the client." *Id.* To prove that breach, a jury often requires expert evidence setting forth the appropriate standard of care owed by a reasonable attorney and how the defendant failed to uphold that standard. *See Vandermay v. Clayton,* 328 Or 646, 655, 984 P2d 272 (1999); *Childers v. Spindor,* 91 Or App 119, 122, 754 P2d 599 (1988).

■■■ Similarly, an attorney owes a client a duty of loyalty, good faith, and fair dealing, which is the concern of a breach of fiduciary duty claim. In that instance, the party claiming the breach

"must plead and prove the breach, and must show that the breach caused an identifiable loss or resulted in injury to the party. Breach of the duty of loyalty is established by

proof that the agent had a conflict of interest or was self-dealing. It is incumbent upon the agent to defend against the claim by showing full disclosure, or some other matter of defense."

*Lindland v. United Business Investments*, 298 Or 318, 327, 693 P2d 20 (1984). In other words, unlike in a legal negligence claim, a plaintiff pursuing a claim for breach of fiduciary duty need not prove the breach element using expert evidence establishing a "reasonable attorney" standard of loyalty, good faith, or fair dealing. Rather, a plaintiff needs to show by a preponderance of evidence that a defendant was disloyal. *Cf. Davis v. Brockamp & Jaeger, Inc.*, 216 Or App 518, 534, 174 P3d 607 (2007) (plaintiff asserting breach of fiduciary duty has burden of proving his claim by a preponderance of evidence).

Consistently with those statements, in Oregon's few cases addressing breach of fiduciary duty claims in an attorney-client context, the parties have brought—and courts have treated—negligence claims and breach of fiduciary duty claims separately, even when those claims are based on the same facts. *See, e.g., Brownstein, Rask, Arenz v. Pearson*, 166 Or App 120, 123 n 1, 997 P2d 300 (2000); *Tydeman v. Flaherty*, 126 Or App 180, 183, 186-87, 868 P2d 755 (1994); *Hilt v. Bernstein*, 75 Or App 502, 506-07, 707 P2d 88 (1985), *rev den*, 300 Or 545 (1986).

Granted, the differences between the claims for legal negligence and breach of fiduciary duty may be subtle in some instances. However, as explained above, the claims are distinct. An attorney negligence claim concerns competence; a breach of fiduciary duty claim concerns loyalty. An attorney may be incompetent in his or her representation of a client, and that incompetence may harm the client's financial interests. However, that does not necessarily mean that the attorney will have been disloyal. Correspondingly, an attorney may act disloyally, and that disloyalty may harm the client's financial interests; however, that does not necessarily mean that the attorney will have been incompetent in representing the client.

Here, the trial court merged those two duties—a duty to act with reasonable care, and a duty of loyalty and good

faith—in the jury instruction on a claim for attorney negligence. Because that is an incorrect statement of the duty owed by an attorney with respect to an attorney negligence claim, we conclude that the trial court erred in giving the jury that instruction.[2]

■ *Harmless Error*

Our determination that a jury instruction was given in error does not end the inquiry. To compel reversal, the error must have "substantially affected" a party's rights. ORS 19.415(2); *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 174, 61 P3d 928 (2003). In *Shoup*, the Supreme Court held that appellate courts "may not * * * order a new trial in a case involving a judgment on a general verdict based on multiple [liability] specifications, one of which is invalid, if there is evidence to support another, valid specification." 335 Or at 176; *see also Jackson v. Robbins*, 192 Or App 372, 376-77, 86 P3d 67 (2004) (concluding that instructional error, if any, was harmless where jury could have reached the same result under alternative allegations of negligence).

Recently, the Supreme Court applied the *Shoup* rule in the context of an erroneous jury instruction in *Wallach v. Allstate Ins. Co.*, 344 Or 314, 180 P3d 19 (2008). In *Wallach*, the trial court instructed the jury that the defendant insurer was liable for aggravation damages resulting from accidents in which the insured was involved, which was an incorrect statement of the law in the circumstances of that case. *Id.* at 322. The jury returned a verdict awarding plaintiff damages.

---

[2] Plaintiff also argues that defendants invited the error because defendants' attorney responded "Right" to the trial court's explanation that it had added the last sentence to the jury instruction based on off-the-record discussions with counsel. As support for that argument, plaintiff relies on *Tenbusch v. Linn County*, 172 Or App 172, 177-78, 18 P3d 419, *rev den*, 332 Or 305 (2001), in which the defendant requested an erroneous jury instruction that the court ultimately gave. In that case, we held that the court's error in giving the instruction was not a basis for reversal, because defendant requested the instruction in the first instance and "infected the entire process." *Id.* at 178-79.

The record does not support our reaching the same conclusion here. Defendants did not request the instruction. Further, we cannot conclude that defendants, by their mere answer of "Right," agreed with the jury instruction and thereby "invited" the error. In fact, in light of the ensuing colloquy between the court and defense counsel, it appears evident that the statement "Right" simply reflected counsel's agreement that the court had correctly described the off-the-record events. Accordingly, we reject plaintiff's invited-error argument.

*Id.* at 327. We held that the error was not harmless and remanded, and the Supreme Court affirmed our decision, holding that,

> "when a trial court incorrectly instructs the jury on an element of a claim or a defense and when that incorrect instruction permits the jury to reach a legally erroneous result, a party has established that the instructional error substantially affected its rights within the meaning of ORS 19.415(2)."

*Wallach*, 344 Or at 329.

**15.** Here, we cannot see how the erroneous instruction was harmless. Again, the instruction given to the jury was:

> "An attorney has the duty to use that degree of care, skill and diligence ordinarily used by attorneys practicing in the same or similar circumstances in the same or similar community. A failure to use such care, skill or diligence is negligence. The attorney and client relationship is a special relationship which carries with it a duty of fair disclosure and dealing."

The first sentence explains the "standard of care" duty that is an element of a legal negligence claim; the second sentence explains that a breach of that duty is negligence. However, the third sentence expands on the duty stated in the first sentence. In other words, it implies that, along with the duty of care explained in the first sentence, an attorney owes duties of fair disclosure and dealing—elements of a breach of fiduciary duty claim—and that breach of *that* duty would, in turn, constitute *negligence*. That error is not harmless, because it allowed the jury to find that defendants were negligent based on a breach of their duty of fair disclosure and dealing.

Plaintiff argues that, even if that statement of the rule is inaccurate, the jury did not necessarily reach a legally erroneous result. He asserts that he made six separate allegations of negligence, among them allegations that defendants were negligent in advising plaintiff to initiate litigation against the bank and in initiating litigation in Oregon where the court lacked subject matter jurisdiction. Given that, and the fact that defendants failed to request a special verdict on

each allegation, plaintiff asserts that any error was harmless under the rule in *Shoup*.

We disagree. The last sentence of the jury instruction created a hybridized and erroneous statement of the law that could have substantially affected the jury's consideration of each of plaintiff's six specifications of negligence in this case. Hence, we reverse and remand for a new trial. ORS 19.415(2).

B. *Motion to Strike Paragraphs 16(a) and 16(b)*

On February 27, 2006, the day before the trial began, defendants filed a motion to strike paragraphs 16(a) and 16(b) in plaintiff's first amended complaint for damages. Again, those paragraphs, which appeared in plaintiff's original complaint filed on October 21, 2004, alleged that defendants were negligent by, among other things:

"a. Advising Plaintiff the Purported Written Agreement was reasonable and fair to the Plaintiff;

"b. Advising Plaintiff the Implied Agreement was reasonable and fair to the Plaintiff, and he was bound to its terms[.]"

Although the trial court appeared initially to deny defendants' motion on the ground that the allegations were in the original complaint and defendants had waited until the day before trial to object to them—that is, on the ground that the motion was untimely—it agreed to take the matter under advisement and, several days later, concluded that the disputed allegations properly alleged a claim for negligence.

Defendants essentially reiterate the same arguments that they advanced regarding the jury instructions, *viz.*, that the allegations in paragraphs 16(a) and 16(b) pertain to a claim for breach of fiduciary duty, not negligence. Plaintiff offers several arguments in response. First, he argues that the proper standard of review of a court's decision to grant or deny a motion to strike is for abuse of discretion, and the trial court did not abuse its discretion in denying defendants' motion, given that defendants had waited until the day before trial to move to strike allegations that were in the original complaint. Second, plaintiff argues that those

allegations properly pertain to a claim of attorney negligence. He reasons that the alleged breaches—defendants' advice that the fee agreements were reasonable and fair—occurred *after* plaintiff and defendants had formed their attorney-client relationship, a relationship that gave rise to defendants' duty to give disinterested advice. Plaintiff essentially argues that that failure to give disinterested advice, as any other attorney in the community would have given, constituted negligence. He invokes for support *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987) (stating that a special relationship or standard of conduct can create and define duty actionable in negligence), and *Tydeman*, 126 Or App at 183-84 (determining that allegations that the defendant "breached his duty to exercise reasonable care in protecting [the plaintiff's] economic interests" properly alleged an attorney negligence claim). We address each argument in turn.

When a party files a motion to strike after it has filed responsive pleadings, it is within the trial court's discretion to grant or deny that motion. *See* ORCP 21 E. Hence, we generally review those decisions for abuse of discretion, and reverse if the grant or denial is not within the "reasonable or permissible range" of options. *Carter v. Moberly*, 263 Or 193, 201, 501 P2d 1276 (1972). Here, however, the trial court based its denial of defendants' motion on a predicate legal question—that is, whether paragraphs 16(a) and 16(b) stated allegations actionable under a claim for legal malpractice. Accordingly, we review for errors of law. *Cf. State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) (explaining that abuse of discretion standard requires decisions to be "within the range of *legally correct* discretionary choices" (emphasis added)); *State v. Walker*, 223 Or App 554, 561, 196 P3d 562 (2008), *rev den*, 346 Or 185 (2009) (reviewing trial court's ruling on motion for a new trial predicated on an interpretation of law for legal error). Accordingly, our task here is to determine whether the trial court erred in concluding that paragraphs 16(a) and 16(b) state proper allegations of negligence.

We conclude that, in the context of the other allegations of the complaint, paragraphs 16(a) and 16(b) state allegations of breach of fiduciary duty rather than allegations of

attorney negligence. Notwithstanding the existing attorney-client relationship at the time that the alleged breaches occurred, those allegations implicate an attorney's duty of loyalty—the breach of which is actionable under a claim for breach of fiduciary duty—not the duty of care, the breach of which is actionable under a claim of negligence. As explained above, 230 Or App at 651-53, we do not agree with plaintiff's understanding of *Georgetown Realty*; nor do we agree that the holdings in *Tydeman* or *Fazzolari* provide relevant support for plaintiff's argument that the breach of any duty arising from the attorney-client relationship is actionable within a claim for negligence. Hence, the trial court erred by concluding that the allegations were proper. On remand, the trial court should strike those allegations from plaintiff's claim for negligence.

C. *Motion* in Limine *to Exclude Evidence of Disloyalty, "Taking Advantage," Bad Faith, and Rescission.*

As an alternative to their motion to strike, defendants moved *in limine* to exclude evidence of disloyalty, "taking advantage," bad faith, and rescission. The trial court denied the motion. Because that motion was made in the alternative to the motion to strike paragraphs 16(a) and 16(b), our conclusion that those paragraphs should be struck from the pleadings will correspondingly exclude evidence pertaining to those allegations.

In sum, as to the negligence claim, we conclude that the jury instruction was given in error and that the error was not harmless. Accordingly, we remand for a new trial. We also conclude that the trial court erred in denying defendants' motion to strike; we remand with instructions that the court strike paragraphs 16(a) and 16(b) from plaintiff's claim for attorney negligence. That disposition obviates the need to address defendants' remaining assignments of error, which may not arise on remand.

## III. DEFENDANTS' BREACH OF CONTRACT COUNTERCLAIMS

A. *Procedural Background*

In response to plaintiff's complaint, defendants asserted several counterclaims, including a claim for breach

of the written contingent fee agreement or, alternatively, *quantum meruit* relief for work performed. Specifically, defendants alleged that plaintiff signed the agreement in June 2003, that defendants performed their obligations under it, and, that, as a result of their efforts, plaintiff obtained title to the properties. They claimed that plaintiff paid them part of the amount due on the contract in May and June 2004, and then discharged them in September 2004 and refused to make further payments. They contended that they were entitled to $189,000 in fees and $3,000 in costs as a result of plaintiff's breach.

Defendants also asserted a counterclaim alleging breach of the oral hourly fee agreement. In that claim, defendants alleged that they and plaintiff had entered an oral hourly fee agreement for the "defense of an accounting action brought by [the bank], and for [defendants] to perform other legal work, unrelated to the Trust, on behalf of * * * plaintiff." They alleged that plaintiff was fully aware of the work that they had done on his behalf under the oral agreement and never objected to their monthly bills, never asked defendants to cease work, and made partial payments on that contract. Under that counterclaim, defendants sought fees of $162,000 and costs of $22,000 or, alternatively, *quantum meruit* relief.

Plaintiff, in his answer, admitted that he had signed the contingent fee agreement, but denied the rest of the allegations. He further asserted affirmative defenses of "rescission" to both claims. To that end, he stated that the contingent fee agreement was "unfair" because it called for a "clearly excessive fee," the agreement lacked legitimate contingency because plaintiff was going to recover the trust properties regardless of defendants' efforts, and defendants breached their fiduciary duties to plaintiff. Likewise, he alleged that the oral hourly fee contract was likewise unfair to plaintiff because it was unilateral, defendants increased plaintiff's fees without his agreement, and defendants did not advise plaintiff to consult with another attorney over the reasonableness of that agreement.

Defendants moved to strike plaintiff's affirmative defenses, arguing that rescission must be asserted as a claim, not as an affirmative defense, and, moreover, that plaintiff's

arguments failed on their merits. Plaintiff clarified at a hearing that his use of the word "rescission" confused matters and that it was not his "intention to have a counterclaim for rescission"; rather, plaintiff asserted that the affirmative defenses merely alleged that the agreements were unenforceable for the reasons stated above. Accordingly, the trial court, "based on stipulation of counsel," struck "[a]ll references to rescission * * * from plaintiff's affirmative defenses."

The parties presented their evidence—often over the other side's objections—over several days of trial. As to the breach of the contingent fee agreement counterclaim, the court submitted the following questions to the jury:

"1. Was there a written contract between [defendants] and [plaintiff]?

"* * * * *

"2. [If so,] did [plaintiff] breach the written contract with [defendants]?"

The jury found that there was a written contract between defendants and plaintiff, but that plaintiff had not breached the contract. It did, however, find that defendants were entitled to recover *quantum meruit* relief totaling $48,000 for the work that they had performed pursuant to the written contract.[3] In response to the question whether there was an oral hourly fee agreement between the parties, the jury found that there was none, and therefore it did not come to any conclusion on whether plaintiff had breached the agreement. The jury did, however, award defendants *quantum meruit* relief totaling $10,000 for the work that they had performed at an hourly rate.

On appeal, defendants advance five assignments of error, but make one overarching argument, *viz.*, that the trial court erred in submitting to the jury the issue of the enforceability of either agreement, because plaintiff failed to properly plead a claim or affirmative defense that would preclude

---

[3] Defendants posit on appeal that the jury's award of $48,000 roughly approximates their hourly rate for services that they performed on plaintiff's behalf up to November 2003, when the trust released the properties to plaintiff. As explained above, 230 Or App at 646, plaintiff, through his negligence claim, recovered the $85,000 that he had paid to defendants on the contingent fee agreement.

defendants' recovery under either agreement. Plaintiff responds generally that defendants failed to satisfy their burden to prove that (1) a valid contract existed under either the contingent fee agreement or the oral hourly fee agreement, and (2) they had performed those contracts. Plaintiff further attacks defendants' assignments of error on procedural grounds and on the merits. We turn to defendants' individual assignments.

B. *Defendants' Motion for a Directed Verdict on the Breach of Contract Counterclaims*

At the close of evidence, defendants moved for a directed verdict on its counterclaim for breach of the contingent fee agreement, arguing that

> "the allegedly excessiveness of fees, illegitimacy of fees and alleged failure to disclose information are not proper defenses to a breach of contract claim. Since there is no evidence contrary to the terms of the express written contract, the only proper response by plaintiff to [defendants'] counterclaim would have been reformation or rescission or ambiguity or undue influence. Those claims were not made and plaintiff concedes that there was no intention to make such claims. * * * The [c]ourt should enter a verdict in [defendants'] favor on liability, leaving to the jury only the question of how much property was recovered for plaintiff by [defendants]."

Similarly, defendants moved for a directed verdict on their counterclaim for breach of the oral hourly fee agreement, arguing that

> "[defendants] proved all the elements of breach of the oral contract, and the defenses of unilateral contract and excessive fees are not proper defenses to a breach of contract claim. Reformation or rescission or ambiguity or undue influence or fraud in the inducement or mutual mistake have not been pleaded. In light of the lack of evidence to the contrary, the oral contract is fully integrated."

The trial court apparently never expressly ruled on the motion; however, because the claims ultimately were presented to the jury, we treat the motions as having been denied.

In reviewing the denial of a motion for a directed verdict, we consider the evidence, including all inferences, in the light most favorable to the party that obtained a favorable verdict, and the verdict cannot be set aside "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary" to support the verdict. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

Whether a contract exists is a question of law. *Dalton v. Robert Jahn Corp.*, 209 Or App 120, 132, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007). A party seeking to recover damages on a contract must plead and prove its own performance or a valid excuse for its failure to perform. *Wasserburger v. Amer. Sci. Chem.*, 267 Or 77, 82, 514 P2d 1097 (1973). However, where a contract has been determined to otherwise be existing, enforceable, and valid, a party may have a right to rescind the contract. *Reynolds Aluminum v. Multnomah Co.*, 206 Or 602, 614, 287 P2d 921 (1955), *cert den*, 350 US 970 (1956). Rescission is an equitable remedy. A party may seek the remedy of rescission on a variety of grounds.

With these principles in mind, we analyze each of the agreements to determine whether the trial court should have directed a verdict in defendants' favor.

1. *Contingent Fee Agreement*

Here, there is no dispute about the existence of the contingent fee agreement. Plaintiff acknowledged that he signed the contract and began making payments to defendants on it. Further, defendants presented evidence of their performance under it, including by negotiating with the bank and its lawyers and eventually participating in litigation that resulted in the release of 11 of plaintiff's 13 trust properties. Hence, the contract would appear to be enforceable unless plaintiff made a claim for rescission or reformation or established some other principle that would preclude enforcement of that contract.

Plaintiff did not do that. Instead, plaintiff argued at trial that he does not owe anything on the contract because of defendants' negligence, inasmuch as (1) defendants failed to

disclose the Reich letter, (2) defendants charged excessive and unreasonable fees in the contingent fee agreement, and (3) defendants set up a contingent fee agreement in a situation where there was no contingency, that is, where plaintiff was going to receive an eventual distribution of the trust properties regardless of defendants' actions.

As an initial matter, it is unclear how or why the supposed unreasonableness or excessiveness of the fee resulting from the contingent fee agreement has any bearing on the enforceability of the agreement. Disputes or complaints about an attorney's "clearly excessive fees" are in the realm of disciplinary proceedings, not a civil action. *See* DR 2-106(A) (2004)[4] (prohibiting attorneys from contracting for or collecting "illegal or clearly excessive fees"); *In re Campbell*, 345 Or 670, 672, 202 P3d 871 (2009). Moreover, to the extent that defendants' other conduct may establish bases for rescission, that claim was not properly before the court, let alone a proper question for the jury.

Accordingly, we cannot identify any evidence in the record raising a potential question of fact for the jury or allowing it to reach the result that it did as to the contingent fee agreement. Hence, the trial court erred by failing to give a peremptory instruction to the jury on plaintiff's liability to defendants for breach of the contingent fee agreement, as defendants requested.[5]

2. *Oral Hourly Agreement*

The oral hourly agreement, however, does not compel the same conclusion. Here, based on the evidence, it is unclear whether there is a contract and, if there is, the extent of the work performed under it. According to the record, defendants acknowledged that they ended the contingent fee

---

[4] The Oregon Rules of Professional Conduct (RPC) became effective January 1, 2005. Because the conduct at issue here occurred before that date, the Disciplinary Rules (DRs) of the Oregon Code of Professional Responsibility apply. *In re Fitzhenry*, 343 Or 86, 88 n 1, 126 P3d 260 (2007).

[5] We note that, although defendants moved for a directed verdict on this issue, "the proper way to achieve what plaintiff sought was a preemptory instruction." *Williams v. Funk*, 230 Or App 142, 146, 213 P3d 1275 (2009) (citing *Dept. of Transportation v. DuPree*, 154 Or App 181, 183 n 3, 961 P2d 232, *rev den*, 327 Or 621 (1998), *cert den*, 526 US 1019 (1999)).

contract and started charging plaintiff by the hour when plaintiff received 11 of the 13 trust properties. At that point, although they performed work for plaintiff unrelated to the trust, they also continued to do work for plaintiff directed at recovering the last two properties from the trust and other trust administration matters. That disparity raises a question of whether there was consideration for the new contract, at least inasmuch as defendants charged plaintiff at the hourly rate for trust-related work. Further, defendants acknowledged that for several months, their hourly charges appeared within the bill for the contingent fee agreement due to a misunderstanding with their billing staff. Additionally, plaintiff testified that, months after he received 11 of the 13 properties, he had not understood that defendants had been charging him at the hourly rate. Finally, it is unclear from the evidence the scope of work the alleged oral agreement encompassed. That evidence indicates that a legitimate question exists as to whether there was mutual agreement to the terms of the oral agreement.

Regardless, then, of whether plaintiff's arguments that the contract is unenforceable were properly before the court, we cannot conclude that, as a matter of law, an oral hourly agreement existed. Accordingly, defendants were not entitled to a directed verdict on the oral hourly agreement. Hence, we affirm that portion of the judgment.

Further, to the extent that defendants' remaining assignments of error pertain to the oral hourly agreement, none presents a tenable basis for us to reverse the judgment as to that agreement. Accordingly, we reject defendants' remaining assignments of error without discussion.

C. *Plaintiff's Cross-Assignment of Error: Trial Court's Denial of Plaintiff's Motion for Order on Affirmative Defense*

After the jury returned its verdict, but before the court entered judgment, plaintiff filed a motion for an order on his affirmative defense of rescission, asking the court as an equitable matter to order that the contingent fee agreement "should be canceled and is not binding upon plaintiff" based on allegations that defendants, in essence, breached their fiduciary duty to plaintiff. The court held a hearing on

that motion and ultimately denied it, concluding that rescission was not a proper affirmative defense under the circumstances; rather, plaintiff should have asserted a counterclaim for rescission in order for the issue to be properly before the court. On appeal, plaintiff cross-assigns error to the trial court's denial of that motion.

Given our conclusions above concerning the omission of counterclaims for rescission in plaintiff's pleadings, 230 Or App at 665, we conclude that the trial court was not obliged to revisit that issue post-trial. Accordingly, the trial court did not err in denying plaintiff's motion.

## IV. PLAINTIFF'S CROSS-APPEAL

Plaintiff cross-appeals from the trial court's order directing a verdict for defendants on plaintiff's claims for slander of title and misuse of civil proceedings. For the reasons stated below, we conclude that the trial court erred in directing verdicts on those claims except for the count related to the California fee litigation.

### A. *Facts and Procedural History*

Plaintiff's claims for slander of title and misuse of civil proceedings arose from events that occurred after plaintiff had removed defendants as his attorneys and defendants subsequently took steps to collect their fees from plaintiff. On appeal from a judgment based on a directed verdict, we view the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party, *Shockey v. City of Portland*, 313 Or 414, 422, 837 P2d 505 (1992), *cert den*, 507 US 1017 (1993), who, in this case, is plaintiff.

In September 2004, defendants filed and recorded a notice of *lis pendens* in California superior court, *see* Cal Civ Proc Code § 405.20 (West Supp 2009) (setting forth requirements for filing a notice of *lis pendens*), in which they stated that, "[n]otice is given that an attorney's lien in the above-entitled action was filed in the above-entitled court * * * by Thompson & Bogran, P.C. against [plaintiff]." The "above-entitled action" was the California trust litigation, that is, the litigation between the bank and plaintiff in which defendants had represented plaintiff. Defendants attached through that lien some of plaintiff's California real property that had been

held by the trust. Defendants eventually released that lien voluntarily.

In October 2004, plaintiff filed his action against defendants in Oregon for legal negligence for work performed by defendants regarding the trust and the bank, including work performed pursuant to the contingent fee agreement. In the following month, defendants filed the California fee litigation in California superior court, in which defendants alleged claims against plaintiff for, among other things, breach of the parties' contingent fee agreement. The California court dismissed that action without prejudice after plaintiff objected to it on the ground that the Oregon proceeding was pending.

In February 2005, defendants filed an attorney's lien pursuant to ORS 87.445 in Oregon, again seeking to attach the properties that plaintiff had acquired from the trust. In that notice, defendants referenced the present Oregon action.

Plaintiff then amended his pleadings in the Oregon action to assert claims against defendants for (a) slander of title based on the filing of the *lis pendens* and statutory lien and (b) misuse of civil proceedings based on the *lis pendens* and the California fee litigation. On both claims, plaintiff alleged as damages the attorney fees that he had incurred in responding to the liens and to the California fee litigation.

Both parties presented evidence relevant to the claims. At the close of evidence, defendants moved for a directed verdict on the misuse of civil proceedings claim on the ground that plaintiff had failed to establish the probable cause element of that claim. After some discussion, the parties and the court agreed that the question of probable cause in a claim for misuse of civil proceedings was a question of law for the court. They agreed to submit to the jury the other elements of misuse of civil proceedings and reserved resolution of the issue whether plaintiff had proved the probable cause element.

Hence, the elements of slander of title and of misuse of civil proceedings—absent the element of probable cause—went to the jury. The jury found in plaintiff's favor on both of

those claims and awarded plaintiff damages for (1) the slander of title claim of (a) $1,502 based on the *lis pendens*, and (b) $6,841 based on the statutory lien; and (2) the misuse of civil proceedings claim of (a) $4,746 based on the *lis pendens*, and (b) $12,122 based on the California fee litigation.

After the jury returned its verdict, the court held a hearing to resolve the issues raised in the directed verdict motion. When they filed their directed verdict motion, defendants also submitted a memorandum of law "in support of * * * any motions filed by the parties on these claims." Defendants argued that plaintiff had failed to establish the probable cause element of the misuse of civil proceedings claim. In the memorandum, defendants also presented a brief argument on the slander of title claim, namely, that the notice of *lis pendens* was properly filed. As such, defendants contended that filing was absolutely privileged under California law and therefore could not be the basis for a slander of title action. However, they did not specifically move for a directed verdict on that claim; moreover, they did not submit any argument regarding the statutory lien or any explanation of why they were entitled to a directed verdict on the slander of title claim stemming from the statutory lien.

In response, plaintiff submitted a memorandum in which he argued, as to the slander of title claim, that defendants were not privileged to file an invalid *lis pendens* and, as to the misuse of civil proceedings claim, that defendants lacked probable cause to initiate the *lis pendens* and California fee litigation. Defendants responded by asking the court to "grant defendants' motions for directed verdict on plaintiff's claims for malicious prosecution *and* slander of title." (Emphasis added.) As to the misuse of civil proceedings claim, defendants disputed that they lacked probable cause to file the *lis pendens* and the California fee litigation; they also argued, alternatively, that defendants adequately pleaded and proved an affirmative defense of reliance on counsel to initiate both the *lis pendens* and California fee litigation. As to the slander of title claim, defendants argued that both the notice of *lis pendens* and statutory lien were valid, and that, accordingly, an applicable privilege precluded an award of relief to plaintiff on either count.

 The parties reiterated their arguments as to both the slander of title and the misuse of civil proceedings claims at the hearing on the motion. At its conclusion, the court granted "the motions as to [those] claims" and stated that the "arguments that were presented to me by the defendants are valid." It memorialized that decision in an order directing verdicts for defendants on both the slander of title claim and the misuse of civil proceedings claims.

Plaintiff cross-appeals. He argues that defendants were not entitled to directed verdicts on the slander of title claim and the misuse of civil proceedings claim. Below, we address those issues and the parties' specific arguments.[6]

## B. *Slander of Title Claim*

Plaintiff argues that defendants were not entitled to a directed verdict on the slander of title claim. As an initial matter, he points out that, at the close of evidence, defendants moved only for a directed verdict on the misuse of civil proceedings claim, not on the slander of title claim; without such a motion, plaintiff asserts, the trial court lacked authority to overturn the jury verdict. Plaintiff further argues that, in any event, to the extent that the trial court overturned the jury verdict based on privilege, both the *lis pendens* and the statutory lien were invalid, and hence, no privilege operated to preclude plaintiff's slander of title claim based on those

---

[6] Plaintiff argues that we should apply California law to these claims. However, he fails to identify a "material difference" between the laws of the two states that would require us to do that. As set forth in *Portland Trailer & Equipment v. A-1 Freeman Moving*, 182 Or App 347, 352, 49 P3d 803 (2002), our two-step process for determining what law applies in a case first requires us to determine whether there is a material difference between the substantive laws at issue; if there is no difference, it is a "false conflict" and Oregon law governs. If there is a material difference between the two states' laws, then we apply the "most significant relationship" test to determine which jurisdiction's law applies. *Id.* at 358-59.

As an initial matter, the parties do not dispute that we look to the respective jurisdictions to determine the validity of the *lis pendens* and the statutory lien. We agree that that approach is proper. That said, we cannot identify a material difference between each state's approaches to probable cause in a misuse of civil proceedings claim, or the defense of advice of counsel to those claims. *Compare Portland Trailer & Equipment*, 182 Or App at 351 (setting forth elements of wrongful initiation of a civil proceeding in Oregon), *with Leonardini v. Shell Oil Co.*, 264 Cal Rptr 883, 894 (App 1989), *rev den*, (Mar 29, 1990), *cert den*, 498 US 919 (1990) (stating elements for malicious prosecution under California law). Hence, we apply Oregon law to the remainder of the issues presented here.

two counts. Defendants argue that plaintiff failed to preserve his argument regarding the absence of a motion for a directed verdict on that claim; they further contend that the slander of title claim was properly dismissed.

As for the failure to move for directed verdict on the slander of title claim, plaintiff appears to be correct that defendants never properly moved for a directed verdict on that claim before the issues went to the jury. However, plaintiff did not point out that deficiency to the trial court when he responded to defendants' post-verdict memorandum seeking a directed verdict on those claims. Furthermore, it appears that he had the opportunity to bring the error to the trial court's attention in the hearings on the entry of the judgment.

Nevertheless, we need not decide that portion of plaintiff's arguments because we conclude that both liens were invalid under the statutes under which defendants filed them. Thus, we conclude that defendants were not entitled to a directed verdict on either count of the slander of title claim.

1. *Validity of the* Lis Pendens

Defendants filed their notice of *lis pendens* pursuant to Cal Civ Proc Code § 405.20 (West Supp 2009):

> "A party to an action who asserts a real property claim may record a notice of pendency of action in which that real property claim is alleged."

A "real property claim" is defined, in part, as

> "the cause or causes of action in a pleading which would, if meritorious, affect * * * title to, or the right to possession of, specific real property * * *."

*Id.* § 405.4. Plaintiff argues that the *lis pendens* was invalid because (a) defendants were not "a party to an action who asserts a real property claim" in the California trust litigation, and (b) that claim is not a "real property claim." Plaintiff's argument continues that, because invalid filings are not privileged under California law, *see Palmer v. Zaklama*, 1 Cal Rptr 3d 116, 125 (2003), *rev den* (Oct 22, 2003), the trial court erred in directing a verdict for defendants on that basis.

We agree. Although there is no California case law discussing who can be "a party to an action who asserts a real property claim," defendants here were representing plaintiff in the California trust litigation, and thus were not asserting a real property claim. Further, California law as to what constitutes a "real property claim" is silent on whether a trust consisting in part of real property, such as the one litigated here, falls within that scope; however the text of Cal Civ Proc Code § 405.20, reveals that it is designed to permit a party to an action who asserts a claim alleging some right to real property to also record notice of *lis pendens* to protect his or her interests in that property while *that action* is pending. We cannot read the text to permit what it appears defendants did here, namely, to attempt to attach property as a nonparty to the underlying action.

Thus, the *lis pendens* appears to be invalid. Hence, defendants are not entitled to a directed verdict as to the claim for slander of title on the *lis pendens* on that basis.

2. *Validity of the Statutory Lien*

Defendants filed their statutory lien in the present Oregon action under ORS 87.445, which provides that "[a]n attorney has a lien upon actions * * * [and] judgments * * * entered therein in the clients' favor," purporting to attach seven of the trust properties through the lien. Plaintiff argues that he is an adversary, not defendants' "client," in the present action, and, as such, defendants, in essence, sought to attach the judgment against themselves when they filed notice of the statutory lien.

The trial court appeared to rely on *Potter v. Schlesser Co., Inc.*, 335 Or 209, 63 P3d 1172 (2003), in ordering the directed verdict for defendants. In that case, the plaintiff lawyer represented a client in an action against the client's party-opponent on a contingent fee basis. The client secretly settled the action with the party-opponent and disappeared with the proceeds. The plaintiff then filed a lien against the proceeds and initiated a new action against the party-opponent to enforce it. *Id.* at 211-12. The issue in *Potter* was whether the plaintiff could enforce the lien against the party-opponent, even though the proceeds against which the lien was filed were no longer in the party-opponent's possession.

The Supreme Court explained that, by operation of law, an attorney's lien attaches to the action brought by that attorney on the client's behalf in a way so that the parties cannot extinguish a lien by settling the underlying action. It further noted that a lien is a charge on an *action*, not the *proceeds*. *Id.* at 214. Hence, the plaintiff could enforce the lien against the party-opponent, even though the proceeds from which he sought payment of his attorney fee were gone.

*Potter* does not appear to apply here. As plaintiff points out, defendants filed a lien on the *present* action. Plaintiff is not defendants' client in the present action, and as such, defendants do not have a stake in the proceeds of this action that make the filing of a lien under ORS 87.445 a proper means of enforcement.[7] *Potter* might be instructive if, for example, defendants' attorneys were representing defendants on a contingent fee basis, attached a lien in these proceedings, plaintiff and defendants settled, and those attorneys then brought an action against either plaintiff or defendants to enforce that lien. Or, it might be applicable if defendants brought an action against the bank (as plaintiff's party-opponent in the trust action) to enforce a lien it has against those properties. However, based on the circumstances here, *Potter* is inapplicable.

Rather, we agree with plaintiff that defendants, as adversaries to plaintiff in the present action, cannot validly file a lien on that action under ORS 87.445. The lien appears to be invalid; defendants have no entitlement to a directed verdict in their favor based on the statutory lien.

Hence, the trial court erred in directing a verdict for defendants on plaintiff's slander of title claim. Accordingly, we reverse and remand with instructions to reinstate the jury verdicts as to that claim.[8]

---

[7] Defendants brought a counterclaim for damages based on breach of contract in the present action. To the extent defendants are awarded damages on that claim, the resulting judgment creates a judgment lien. ORS 18.150(1). Thus, a lien under ORS 87.445 in the present case is unnecessary, given that, if successful, defendants may obtain a lien for the proceeds that they seek in this litigation.

[8] Our disposition here is awkward in at least three respects. First, the parties and trial court did not follow the proper mechanism for determining issues presented on a motion for directed verdict. Although courts generally grant or deny a motion for directed verdict before the issues go to the jury, the court may reserve

## C. *Misuse of Civil Proceedings Claim*

Plaintiff alleges that defendants misused civil proceedings by filing the *lis pendens* and the California fee litigation to recover attorney fees from plaintiff. Defendants moved for a directed verdict on both counts of that claim, on the basis that plaintiff failed to show that defendants lacked probable cause to initiate the civil proceedings.

 Under Oregon law, the elements of a claim for wrongful initiation of a civil proceeding are (1) commencement and prosecution by the defendant of a judicial proceeding against the plaintiff; (2) the termination of the proceeding in the

---

ruling on a directed verdict. *See* ORCP 63 B ("In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in such party's favor if the verdict is otherwise than would have been directed * * *."). Here, as noted above, defendants did not move for a directed verdict on the slander of title claim; further, the court "reserved" issues pertinent to the directed verdict for after the jury verdict, then— without a motion for judgment notwithstanding the verdict from defendants, *see* ORCP 63 A—granted the directed verdict. To the extent that the trial court granted a directed verdict *after* the jury returned its verdict, it did not have authority to do that. However, neither party argued that to us or alerted the trial court to that problem.

That problem leads to the second complication: normally when we reverse a judgment based on a directed verdict, we remand the case to the trial court. *See, e.g., Boynton-Burns v. University of Oregon,* 197 Or App 373, 383, 105 P3d 893 (2005). Remand is appropriate because a jury does not have an opportunity to find necessary facts when the trial court grants a motion for a directed verdict at the close of evidence.

However, because the trial court reserved the issues for *after* the jury's verdict, and it appears that all other elements of the claim went to the jury, there is nothing for the trial court to do upon remand other than to reinstate the jury verdict.

And that raises the third difficulty: it does not appear that plaintiff presented adequate evidence of damages to sustain a claim for slander of title. *See Erlandson v. Pullen,* 45 Or App 467, 473, 608 P2d 1169 (1980) (special damages element requires a plaintiff to allege "that some person or persons were prepared to purchase some part of [the] plaintiff's interest in the property"). Here, plaintiff claimed as damages his attorney fees incurred in disputing the liens. Those are not special damages, and had defendants argued that ground to the trial court, the trial court should have directed a verdict in defendants' favor, provided that plaintiff could not develop the record sufficiently to show that he had incurred special damages.

Yet, defendants neither argued that at trial nor to us on appeal. Further, had defendants raised the issue, theoretically, plaintiff could have presented evidence supporting an award of special damages consistent with the rule in *Erlandson.* Hence, we cannot affirm the trial court's grant of the directed verdict on a "right for the wrong reason" basis. *See Outdoor Media Dimensions Inc. v. State of Oregon,* 331 Or 634, 659-60, 20 P3d 180 (2001) (stating that new alternative ground cannot be basis for affirmance if it appears that the opposing party could have developed the record differently had that ground been raised at trial).

plaintiff's favor; (3) absence of probable cause to prosecute the action; (4) existence of malice; and (5) damages.[9] *Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 237-38, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005). "Probable cause" means that the person initiating the civil action "reasonably believes" that he or she has a good chance of prevailing—that is, he or she has a subjective belief, and that belief is objectively reasonable. *Id.* at 238. Voluntary dismissal of a claim does not create a presumption that the "absence of probable cause" element is satisfied. *Id.* at 239.

Whether a defendant had probable cause to initiate a proceeding is a question of law for the court if the facts or inferences are undisputed; if the facts are disputed, then a jury must decide the facts and the court must instruct the jury what facts constitute probable cause. *Varner v. Hoffer*, 267 Or 175, 178-79, 515 P2d 920 (1973); *Roop*, 194 Or App at 239.

Reliance on advice of counsel is an affirmative defense to a claim of wrongful initiation of civil proceedings. *Hartley v. Water Resources Dept.*, 77 Or App 517, 520, 713 P2d 1060, *rev den*, 301 Or 78 (1986). To utilize that defense, a defendant must plead it. *See* ORCP 19 B (requiring a defendant to plead any matter "constituting an avoidance or affirmative defense"). Specifically, the defense of reliance on advice of counsel to a claim of wrongful initiation of a civil proceeding succeeds if the defendant sought advice of counsel in good faith and after a full and frank disclosure of all pertinent facts. *Hartley*, 77 Or App at 520-21.

1. *Probable Cause to File the* Lis Pendens

In defendants' view, the trial court properly directed a verdict in their favor based on (1) the undisputed fact that the contingent fee agreement provided that plaintiff was to pay defendants a percentage of the value of the real property obtained from the trust litigation, and (2) the testimony of O'Meara, an attorney from the California firm that defendants had hired, stating that it was her belief that filing the

---

[9] Special damages are not a required element for a claim of misuse of civil proceedings; attorney fees incurred by the party asserting the claim are a proper component of damages under that claim.

*lis pendens* was proper under California law and that it was not done to annoy or harass plaintiff. Defendants do not invoke any evidence in the record indicating that they fully and frankly disclosed all relevant information to O'Meara, nor that they relied on O'Meara's advice in good faith.

Plaintiff argues that, because defendants' filing of the *lis pendens* had no legal basis, defendants lacked objective probable cause—in other words, a reasonable person looking at the *lis pendens* statute would understand that the statute did not provide a basis under which to file the *lis pendens*. Further, plaintiff invokes the testimony of Coyne, a former associate with plaintiff's current attorney's firm in Portland, who testified to a conversation with Hunter, an attorney in the California firm that filed the *lis pendens* on defendants' behalf. According to Coyne, at the end of that conversation, Hunter acknowledged that the *lis pendens* was improper; additionally, Hunter acknowledged that Thompson had directed him to file the *lis pendens* and that he had had "very little dialogue" with Thompson regarding the basis for filing it.

■ Given that, we cannot conclude that defendants were entitled to a directed verdict as to probable cause to file the *lis pendens*. Based on the evidence that California counsel filed the *lis pendens* without much discussion, that Thompson directed that filing, that California counsel subsequently acknowledged that the lien was improper and removed the lien after discussion with plaintiff's attorneys, defendants lacked objective probable cause to file the *lis pendens*.

Further, to the extent that defendants assert reliance on counsel as a ground for the directed verdict, defendants did not expressly assert an affirmative defense on those grounds. Even if defendants' affirmative defense was properly before the court, defendants do not direct us to any evidence that would require a jury to find that defendants provided a full and frank disclosure of the circumstances or that they relied on the California counsel's advice in good faith.

Accordingly, defendants are not entitled to a directed verdict on that basis.

2. *Probable Cause to Initiate the California Fee Litigation*

We cannot arrive at the same conclusion as to the California fee litigation. Plaintiff argues primarily that that litigation was "legally untenable" and that defendants filed it in violation of Cal Civ Proc Code § 430.10(c) (West Supp 2009) (a party may object to a complaint against it if there is "another action pending between the same parties on the same cause of action"). He argues that that provision is identical to the equivalent Oregon rule and, given that, defendants subjectively and objectively knew that they did not have probable cause to file the action.

We do not find plaintiff's arguments to be persuasive. It is not evident that defendants filed the "same cause of action" in California, given that they filed for breach of contract there and plaintiff's Oregon complaint was limited to claims for legal negligence. Additionally, the record indicates that the California court dismissed defendants' claim without prejudice and with leave to refile it if the Oregon litigation did not resolve the parties' disputes. Moreover, there is no compulsory joinder rule in Oregon compelling joinder of claims under these circumstances, *see* ORCP 24 A (stating rule for permissive joinder of claims), and many of the events pertaining to defendants' claim for breach of contract occurred in California. Based on that evidence, we cannot conclude that defendants lacked probable cause to file the California fee litigation. The trial court did not err in granting a directed verdict in defendants' favor on that count.

Hence, we conclude that the trial court erred in directing a verdict in defendants' favor as to misuse of civil proceedings based on the filing of the *lis pendens*; accordingly, we reverse and remand with instructions to reinstate the jury verdict as to that count. However, we affirm the trial court's order granting a directed verdict to defendants for the count based on the California fee litigation.

V. CONCLUSION

In summary, as to plaintiff's legal negligence claim, we conclude that the court erred in the negligence instruction that it gave the jury and that the error was not harmless.

Additionally, we conclude that the trial court erred in denying defendants' motion to strike paragraphs 16(a) and 16(b) from plaintiff's complaint.

Furthermore, as to defendants' breach of contract counterclaims, we conclude that the trial court erred in denying defendants' motion for a peremptory instruction on liability on the breach of the contingent fee agreement claim, but that it correctly denied the directed verdict motion as to the breach of the oral hourly agreement claim.

Finally, we conclude that the trial court properly granted a directed verdict on the misuse of civil proceedings claim based on the California fee litigation count but erred in directing verdicts in defendants' favor on plaintiff's slander of title and misuse of civil proceedings claims based on the *lis pendens* and statutory lien.

On appeal, judgment on claim for legal negligence reversed and remanded for new trial with instructions to strike paragraphs 16(a) and 16(b) from plaintiff's complaint; judgment on counterclaim for breach of written contingent fee contract reversed and remanded. On cross-appeal, judgments for directed verdict on slander of title and misuse of civil proceedings claims involving *lis pendens* and statutory lien reversed and remanded with instructions to reinstate the jury verdicts on those claims. Otherwise affirmed.